## Case No. 11,758.

### RICH et al. v. LIPPINCOTT et al.

[2 Fish. Pat. Cas. 1;[1] 1 Pittsb. Rep. 31; 1 Pittsb. Leg. J. p. 21; No. 7; 26 Jour. Fr. Inst. (3d S.) 10; 1 Pittsb. Leg. J. 9.]

Circuit Court, W. D. Pennsylvania. May, 1853.

PATENTS—CLAIMS — INVENTION —ABANDONMENT—DELAY—FIRE-PROOF SAFES.

1. The law requires the claim of invention to be set forth precisely and specifically, and precludes the patentee from alleging it to be different or more enlarged than he has thus set it forth.

2. If the patentee was the first and original inventor or discoverer of the application and use of plaster of Paris to the filling of fire-proof safes, and this application produced a new and useful result, it can not be doubted that it is the proper subject of a patent.

3. It is not for the discovery of the fact or principle that gypsum has certain qualities not before known, to-wit: that it was a non-conductor of heat, but it is for the application of this substance, possessing such qualities, to produce a beneficial result—a manufacture or machine better than any before known.

4. The patentee does not, and could not, claim all compositions known and unknown of which gypsum might be a component part, which might be used as non-conductors in lining safes.

5. If the defendant uses a composition known and used as a non-conductor for twenty-five years or more, which was not a mere colorable evasion of the plaintiff's patent, taking advantage of his discovery, and merely varying it by a mixture of other ingredients to cover the infringement, even though plaster of Paris may have been one of the ingredients of such composition, the use of it is not necessarily an infringement of plaintiff's patent.

6. If the first inventor reduced his theory to practice, and put his machine or other invention into use, the law would never intend that the greater or less use in which it might be, or the more or less widely the knowledge of its existence might circulate, should constitute the criterion by which to decide upon the validity of any subsequent patent for the invention.

7. A patent may be defeated, by showing that the thing secured by the patent had been discovered and put into actual use prior to the discovery of the patentee, however limited the use or knowledge of the prior discovery might have been.
[Cited in Monce v. Woodworth, Case No. 9,-706.]

8. If the original inventor of a machine abandons the use of it, and does not take out a patent first, no other person can entitle himself to a patent for it. There are exceptions to this

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

rule, as in the case of a lost art, where the knowledge of it has been lost for ages—or of more recent inventions, where the knowledge of the improvement is as completely lost as if it had never been discovered.

9. If an earlier application by the inventor is for the same subject-matter as he afterward patents—and if such application was not withdrawn by him, but the delay was caused by the conduct of the commissioner of patents, in refusing to grant a patent, then the inventor should not be considered to have abandoned his invention to the public. unless he abandoned it before his first application.

[Cited in Bevin v. East Hampton Bell Co., Case No. 1,379; Johnsen v. Fassman, Id. 7,-365.]

10. If, on the contrary, the first application was not for the invention subsequently patented, and was therefore refused by the commissioner, or was withdrawn or abandoned by the applicant, and in the meanwhile the invention had gone into public use for more than two years before the application which really described it, the patent would be void.

[Cited in Wickersham v. Singer, Case No. 17,610.]

This was an action on the case [by Crandale Rich, Almon Ruff, and John G. Stephen against Joseph Lippincott and William C. Barr] tried by Mr. Justice Grier and a jury, to recover damages for the infringement of letters patent [No. 3,117] granted to Daniel Fitzgerald, June 1, 1843, for an "improvement in fire-proof chests and safes." The same patent was involved in the case of Adams v. Edwards [Case No. 53]. The patent was by mesne assignment vested in the plaintiffs, with the exception of New York and the New England states. The following is an abstract of the specification in the words of the patentee: "I take two iron chests, in the common and ordinary way of making iron safes, which is well known to those engaged in this branch of business; one smaller than the other, which, when the safe is put together, forms the inner chest or inner part of the safe. The other chest is made about three inches larger than the inner one, and so as, when put together, it will form the outer part or crust of the safe, and leave a space. between the inner and outer chests of the safe of about three inches; which space may vary a little, more or less, when the chests are put together, but should be the same all around and in every direction. The inner and outer doors, when two doors are used, are prepared in the same way, leaving a space, as above, between the inner and outer crust of each door, which space is left for a like purpose with that left between the inner and outer crust or face of the door, and for a like purpose, and should be fitted to the chest or safe with great accuracy. The edges and opening for the door are to be neatly finished, as in other chests. I then take plaster of Paris, or gypsum, and having boiled it or baked it in an oven, and calcined it, and reduced it to powder, I mix it with water till it is about the consistency of cream or thin paste, so fluid as that it may readily

be poured into the space left as above to receive it; and I then fill all the space with the plaster of Paris, putting in some sheets of mica between the inner and outer chests, to aid if necessary in checking the progress of the heat. * * * The above composition or preparation of gypsum may be mixed with several other articles, not contrary to its nature, with a view to increase its efficacy in resisting the action of fire; but, from my experience, I doubt if they have much effect. * * * The chemical properties of this article are such that, by the application of intense heat, it imparts a vapor or gas, or some other properties, which effectually stay the progress of fire, and arrest the influence and effects of heat. * * * I therefore claim, as my discovery and invention and improvement, the application and use of plaster of Paris, or gypsum, in its raw state, or prepared as above, either alone or with mica, in the construction of all iron chests or safes, in the manner above described, or in any other manner substantially the same."

The points of defense chiefly relied upon were as follows: First. That the composition used by the defendants was composed of various materials. of which plaster of Paris formed only about one third part. Second. That plaster of Paris had long been known and used as a non-conductor of heat before Fitzgerald's discovery; and that it had been used in 1832 by one James Conner, of New York, in the construction of a fire-proof safe. Third. That Fitzgerald had suffered iron safes filled with plaster, on the plan of his patent, to be publicly sold and used for more than two years before his application for letters patent.

Upon this point, the plaintiffs offered testimony to show that Fitzgerald had directed his attention to plaster of Paris, and had made experiments as to its non-conducting qualities as early as 1830; that he made a model, and tested its merits in 1832; and having proved it by public exhibition in New York and Boston, applied for a patent in April, 1836; and continued the application, notwithstanding much resistance by the patent office, until it was finally granted in 1843.

The defendants offered the records of the patent office, and other evidence. to show that Fitzgerald's application for a patent in 1836 was for a combination of plaster, with isinglass, saltpeter, and potash, which was rejected by the commissioner; and that the application for his present patent was not made until 1839, and in the meantime, he had engaged in the public manufacture and sale of safes, and suffered others to do so without objection, since the year 1836.

A. W. Loomis and Seth P. Staples, for plaintiffs.

Shaler, Stanton & Umbstetter, for defendants.

GRIER, Circuit Justice (charging jury). The plaintiffs claim to be the assignees of a patent granted to Daniel Fitzgerald June 1, 1843. In April, 1839, previous to the issuing of the patent, Daniel Fitzgerald sold and assigned his inchoate right to his discovery or invention to Enos Wilder. The assignment, though antecedent to the patent, has been decided to be a valid legal assignment of the invention afterward patented in the name of the inventor. Enos Wilder afterward (September 1, 1843) assigned all his right and title to Benjamin G. Wilder, and on June 25, 1847, Benjamin G. Wilder assigned the same (with the exception of New York and the New England states) to Crandale Rich, Almon Ruff, and John G. Stephen, the plaintiffs in this case.

The patent purports to be for "an improvement in fire-proof chests and safes."

It is important that you note particularly the claim as stated in the specification of what the patentee specially sets forth as his peculiar invention. The law, for good reasons, requires this to be set forth precisely and specifically, and precludes the patentee from alleging it to be different or more enlarged than he has thus set it forth. It is in these words:

"I therefore claim as my discovery and invention and improvement, the application and use of plaster of Paris, or gypsum, in its raw state or prepared as above, either alone or with mica, in the construction of iron chests, or safes, in the manner above described, or in any other manner substantially the same."

If Fitzgerald be the first and original inventor or discoverer of the application and use of plaster of Paris to this purpose, and this application produce a new and useful result, it can not be doubted that it is the proper subject of a patent. It is not for the discovery of the fact or principle that the gypsum has certain qualities, to wit: that it was a non-conductor of heat, but it is for the application of this substance possessing such qualities, to produce a beneficial result—a manufacture or machine better than any before known.

Assuming for the present, that the patentee is the original inventor of the subject-matter of this patent (of which the patent is prima facie evidence), and that it is not only a new but a useful invention (which last is not disputed):

Your first inquiry will be, Have the plaintiffs proved to your satisfaction that the defendants have infringed the franchise or monopoly granted by this patent? A question of infringement is one of fact, which it is the province of a jury to decide.

It is impossible for the court to give you a general or abstract definition of what is an infringement, which will be easily applied to every variety of case. "An infringement is said to take place whenever a party avails himself of the invention of the patentee, without such a variation as will constitute a new discovery." "It may be by making, using, or selling" the thing patented. When the subject-matter of the patent is a manufacture, the question will be whether in reality and in substance the defendant has availed himself of the invention of the patentee; a mere colorable variation in the process or application should not be allowed to protect a defendant.

In order to apply these principles to the present case, you must carefully observe the peculiar nature of the invention, improvement, discovery, or composition of matter claimed in the specification. In the specification the form or proportions of the safe are not claimed, nor the use of one chest within another, nor the idea of interposing a lining of some non-conducting substance between the outer and the inner chests to resist the effect of fire. Salt, charcoal, asbestos, soapstone, and perhaps many other substances and compounds have been used for this purpose. If the patentee has discovered some substance possessing the requisite qualities for the purpose required, he has a right to patent his invention. But the defendants have an equal right to make or compound any other essentially different composition or substance for the same purpose. But they have no right to avail themselves of the plaintiffs' invention or discovery by making some colorable alteration in the mode of its application. Now, what is the composition of matter which the plaintiffs' patent claims to have invented for the purpose of lining chests or safes? It is plaster of Paris in the raw state, or calcined or prepared as set forth in the specification, either alone or with mica. Have the defendants used substantially this substance or composition of matter?

Price, the plaintiffs' witness, says he furnished the composition used by defendants in making their safes; "one of his own making;" that he had used it twenty-five years; that it contained not one-third plaster, and many other ingredients.

Now, if it be true that the composition of matter sold by witness to defendants was one known and used as a non-conductor for twenty-five years and more, and was not a mere colorable evasion of the plaintiffs' patent, taking advantage of the patentee's discovery, and merely varying it by a mixture of other ingredients to cover the infringement, even though plaster of Paris may have been one of the ingredients of such composition, the use of it is not necessarily an infringement of the plaintiff's patent.

The patentee does not and could not claim all compositions known and unknown of which gypsum might be a component part, which might be used as non-conductors in lining safes. He claims gypsum alone, or with mica. If, in your opinion, the composition used by defendants be substantially

the same with that patented, or the defendants have merely varied their composition to cover the infringement, while they obtain the benefit of the patentee's discovery, you should find it an infringement. If not, your verdict should be for defendants on this point, and, in such case, your labors might end here.

2. The next question to be considered (if you find the defendants have infringed the patent), is whether the patentee is the original and first inventor. As I have said, the patent is prima facie evidence of this, i. e., sufficient till the contrary is shown.

The patent act of 1836 (section 6) [5 Stat. 119] provides "that any person or persons having discovered or invented any new or useful art, machine, manufacture, or composition of matter, or any new or useful improvement on any art, machine, manufacture, or composition of matter not known or used by others before his or their discovery or invention thereof," may apply for a patent, etc. The applicant is required "to make oath or affirmation that he does verily believe that he is the original and first inventor, etc., and that he does not know or believe that the same was ever before known or used." The commissioner is required, before he is allowed to grant a patent, to inquire whether "the same had been invented or discovered by any other person in this country prior to the alleged invention or discovery thereof by the applicant," etc.

The mere speculation of a philosopher or mechanic, never put into actual practice or operation, will not deprive a subsequent inventor, who has employed his labor and talents in putting it into practice, of the reward due to his ingenuity and enterprise. But, if the first inventor reduced his theory to practice, and put his machine or other invention into use, the law never would intend that the greater or less use in which it might be, or the more or less widely the knowledge of its existence might circulate, should constitute the criterion by which to decide upon the validity of any subsequent patent for the invention. A patent may, therefore, be defeated by showing that the thing secured by the patent had been discovered and put into actual use prior to the discovery of the patentee, however limited the use or knowledge of the prior discovery might have been. Bedford v. Hunt [Case No. 1,217].

If the original inventor of a machine abandons the use of it, and does not take out a patent first, no other person can entitle himself to a patent for it. Evans v. Eaton, 1 Pet. [26 U. S.] 323. There are exceptions to this general rule, as in the case of a lost art, where the knowledge of it has been lost for ages, and, in the present case, if you should find that Conner discovered this valuable property of plaster of Paris before Fitzgerald had put it into practice

by lining the interstices of a safe, but that the safe itself had disappeared, and the knowledge of the improvement was as completely lost as if it had never been discovered, and Fitzgerald had afterward made the same invention and discovery anew, his patent might stand. But, if Conner's safe was in existence and in use, and the knowledge of it not entirely forgotten and lost, his omission to bring it into public use or notice, by public exhibitions or experiments, would not give Fitzgerald, if he was a posterior inventor, a right to a patent. Conner might have abandoned its use, and been ignorant of the extent of its value, yet, if his invention was substantially the same with that of Fitzgerald, the latter would not, upon that ground, be entitled to a patent, provided Conner's safe and its mode of construction were still in the memory of Conner, or in the knowledge or use of others, before they were recalled by Fitzgerald's patent. Gaylord v. Wilder, 10 How. [51 U. S.] 498.

The evidence bearing upon this point has been very fully and ably commented on by the counsel. It is for you to apply it to the principles of law announced by the court.

3. If you should find, from the evidence, that Fitzgerald was the first inventor of the subject-matter of the patent, you will then have to consider a third point made by defendants' counsel, namely, whether Fitzgerald had abandoned his invention to the public before his application for a patent.

A first inventor can not acquire a good title to a patent if he suffer the thing invented to go into public use, or to be publicly sold for use, more than two years before he made application for a patent. "By a public use is meant a use in public; that is to say, if the inventor himself makes and sells the thing to be used by others, or, if it is made by one other person only, with his knowledge and without objection, before his application for a patent, a fortiori if he suffers it to get into general use, it will have been in public use." Curt. Pat. § 279.

This patent was issued in 1843; the immediate application on which it was granted was made in 1839; Salamander safes had been and sold from 1835 to 1839 by Fitzgerald and others. The affidavit of Fitzgerald, filed with the application, was made before the burning of the patent office in 1836, and renewed in 1837. Defendants deny that this application was for the invention patented in 1843; but say that it was for an entirely different one, being a composition of salt, saltpeter, plaster, etc., and, moreover, that this application was abandoned and the money paid returned; and, that after Wilder had purchased this claim in 1839, the first application for the invention, as now patented, was made by Wilder, who, in resuscitating the abandoned claim, endeavored to connect it with the former abandoned application for a different invention, in order to

save it and give validity to his patent. Which of these hypotheses is true, is for you to decide; the testimony, letters, and documents by which the theory of either party is supported, are before you.

If you find that the application of 1836, renewed in 1837, was for this same subject-matter now patented, and if such application was not withdrawn by Fitzgerald, but the delay was caused by the conduct of the commissioner of patents in refusing to grant the patent for the same invention since patented, then Fitzgerald should not be considered to have abandoned his invention to the public unless he abandoned it before 1836, which is not contended.

On the contrary, if you believe that the application of 1836 and 1837 was not for the same invention with that patented, and, therefore, was refused by the commissioner, or was withdrawn and abandoned by the applicant, and continued so until Enos Wilder got up an application for the present patent, and, in the meanwhile, the invention had gone into public use for more than two years, then you will find this point for the defendants, and they will be entitled to your verdict.

The jury found a verdict for the defendants.

2 [NOTE. The case was one of much interest, both from the reputed value of the patent right, the damages claimed in this case, and from the previous litigation that had taken place in New York and Boston under the same patent. In a suit tried before Judge Nelson at New York, in the year 1848, a verdict was found sustaining the validity of the patent. In that case, for the first time in this country, the doctrine was announced that if a new machine or art had been previously known, and had been afterwards entirely lost sight of and forgotten, and the memory of the old machine or art had passed away, such a prior knowledge would not invalidate a subsequent patent obtained by one who had discovered anew the same art or machine. This view was adopted by Judge Nelson in his charge to the jury on the trial of that cause, who thereupon found a verdict in favor of the patent, [case unreported,] and the same view was afterwards sanctioned by the supreme court of the United States.

[Justices McLean, Daniels, and Grier dissented from the opinion delivered by the court. The peculiar state of the facts on which that question came before the jury in New York, and before the supreme court, was this: It appeared that James Conner, who carried on the business of a stereotype founder in the city of New York, made a safe for his own use between the years 1829 and 1832, in which plaster of Paris was employed as a non-conductor, for the protection of his papers against fire; and that he continued to use this safe until 1838, when it passed into other hands. It was kept in his counting-room, and known to the persons engaged in the foundry; and after it passed out of his hands he used others of a different construction. It did not appear from the evidence in New York, what became of this safe afterwards. And there was nothing in the testimony from which it could have been inferred that its mode of construction was known to the person into whose possession it fell, or that any value was attached to it as a place of security for papers against fire, or that it was ever used for that purpose. Upon these facts the court instructed the jury, that "if Conner had not made his discovery public, but had used it simply for his own private purpose, and it had been finally forgotten or abandoned, such a discovery and use would be no obstacle to the taking out of a patent by Fitzgerald, or those claiming under him, if he was an original, though not the first, inventor or discoverer."

[In delivering the opinion of the court, Chief Justice Taney compared Fitzgerald's discovery to the discovery of one of the lost arts. "It is well known," he said, "that centuries ago discoveries were made in certain arts, the fruits of which have come down to us, but the means by which the work was accomplished are at this day unknown. The knowledge has been lost for ages. Yet it would hardly be doubted, if any one now discovered an art thus lost, and it was a useful improvement, that, upon a fair construction of the act of congress, he would be entitled to a patent. Yet he would not literally be the first and original inventor; but he would be the first to confer on the public the benefit of the invention. He would discover what is unknown, and communicate knowledge which the public had not the means of obtaining, without his invention. Upon the same principle, and upon the same rule of construction, we think that Fitzgerald must be regarded as the first and original inventor of the safe in question. The case, as to this point, admits that, although Conner's safe had been kept and used for years, yet no test had been applied to it, and its capacity for resisting heat was not known. There was no evidence to show that any particular value was attached to it after it passed from his possession, or that it was ever afterwards used as a place of security for papers; and it appeared that he himself did not attempt to make another like the one he is supposed to have invented, but used a different one. And upon this state of the evidence the court put it to the jury to say whether this safe had been finally forgotten or abandoned before Fitzgerald's invention, and whether he was the original inventor of the safe for which he obtained the patent; directing them, if they found these two facts, that their verdict must be for the plaintiff. We think there is no error in this instruction. For if the Conner safe had passed away from the memory of Conner himself and of those who had seen it, and the safe itself had disappeared, the knowledge of the improvement was as completely lost as if it had never been discovered. The public could derive no benefit from it until it was discovered by another inventor. And if Fitzgerald made his discovery by his own efforts, without any knowledge of Conner's, he invented an improvement that was then new, and at that time unknown, and it was not the less new and unknown because Conner's safe was recalled to his memory by the success of Fitzgerald's." This was the principal question presented in the case as tried at New York, and as argued before the supreme court. See Gayler v. Wilder, 10 How. [51 U. S.] 477.

[In the present case much light was thrown upon that question by the production on both sides, of very full testimony in reference to the nature and extent of Conner's prior use. The relative merits of Fitzgerald and Conner as inventors were more fully investigated in this case than had been heretofore done, and the precise extent to which the manufacture of Conner had been carried was brought before the court and jury. In instructing the jury as to the principle of law involved in this question, Mr. Justice Grier adopted and cited the decision of the supreme court above referred to, and left the application of that principle to the particular facts developed as at this trial, to the jury.] 3

[For other cases involving this patent, see Wilder v. McCormick, Case No. 17,650; Wilder v. Gayler, Id. 17,648; Wilder v. Gayler, Id. 17,649; Wilder v. Adams, Id. 17,647.]